COURT OF APPEALS OF VIRGINIA

Present: Chief Judge Decker, Judges Beales and Raphael
Argued at Norfolk, Virginia

UNPUBLISHED

TYRONE LAMONT PAIR

v.      Record No. 1507-22-1

COMMONWEALTH OF VIRGINIA

MEMORANDUM OPINION[*] BY
CHIEF JUDGE MARLA GRAFF DECKER
JANUARY 16, 2024

FROM THE CIRCUIT COURT OF THE CITY OF NEWPORT NEWS
Tyneka L.D. Flythe, Judge

Brett P. Blobaum, Senior Appellate Attorney (Virginia Indigent
Defense Commission, on briefs), for appellant.

Aaron J. Campbell, Assistant Attorney General (Jason S. Miyares,
Attorney General, on brief), for appellee.


Tyrone Lamont Pair appeals his conviction of second-degree murder in violation of Code

§ 18.2-32. He argues on appeal that the trial court erred when it allowed testimony about the

existence and service of a recent emergency protective order that the victim had obtained against

him the day before she was killed. The appellant further argues that the evidence was insufficient

to sustain his conviction. For the following reasons, we disagree and affirm the conviction.

---

[*] This opinion is not designated for publication. *See* Code § 17.1-413(A).

BACKGROUND[1]

In December 2020, the appellant and Sammy Pair, the victim, lived together in a townhouse. The appellant and the victim were married, but the state of their marriage was "not good." On December 27, 2020, the victim informed the appellant that she was moving out of their shared home. Four days later, on December 31, she obtained an emergency protective order (EPO) against the appellant. The order was served personally on him at the townhouse later that day.

That same day, Felicia Worsley, an acquaintance of the appellant, arrived at the townhouse at about 6:00 p.m. to spend the holiday weekend with him.[2] When Worsley and the appellant were in the townhouse, she heard "keys at the door." The appellant opened the front door, and Worsley heard a woman's voice but did not see the woman.[3] The appellant told Worsley to leave by the back door, move her car to another parking lot, and wait in her car. While Worsley was waiting in the parking lot, she saw some "police lights." The appellant then joined Worsley and told her that he had to be away from the townhouse so the woman who was there "could get her belongings out." He and Worsley left at about 7:15 p.m. and went to a nearby hotel where they stayed for the weekend.

---

[1] On appeal, we review "the evidence presented at trial in the light most favorable to the Commonwealth, the prevailing party below." *Lambert v. Commonwealth*, 70 Va. App. 740, 746 (2019) (quoting *Hawkins v. Commonwealth*, 64 Va. App. 650, 652 (2015)). "Viewing the record through this evidentiary prism requires us to 'discard the evidence of the accused in conflict with that of the Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn'" from that evidence. *Commonwealth v. Barney*, ___ Va. ___, ___ (Mar. 16, 2023) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323-24 (2018) (per curiam)).

[2] Worsley had met the appellant on a dating website the previous month. She knew him as "Tory Richardson" and was not aware that he was married.

[3] Although the woman was not specifically identified, the reasonable inference is that she was the victim.

Around noon the next day, January 1, 2021, Tim Williams was talking to the victim on the phone when he heard a "banging sound" in the background. He also heard the voice of the victim as she screamed in pain. Williams heard a male voice say "[t]ell that f-----g n----r . . . come through too." After that, the call abruptly disconnected at 12:07 p.m. The data taken from the residential security system at the townhouse showed that the back door opened at 12:02 p.m., the front door opened and closed at 12:08 p.m., and the back door closed at 12:09 p.m.

Williams called the victim back repeatedly after the call disconnected, but no one answered. At 12:31 p.m., he called 911. Williams had no further contact with the victim. Her phone stopped receiving data at 1:14 a.m. on January 2, 2021, and was never recovered.

The appellant was in the area of the townhouse on January 1 from 11:56 a.m. until 12:15 p.m. Worsley drove him there in her car because he said he wanted "to check on his cars" near the townhouse. She waited for him in her car in the parking lot as he got out and left her sight.

In response to Williams's call to 911 on January 1, a Newport News police officer arrived at the townhouse at 12:35 p.m. No one appeared to be home, and nothing obvious was amiss. The officer left without forcing entry.

The next day, January 2, 2021, Worsley and the appellant returned to the area of the townhouse at 6:39 a.m. and again at 8:36 p.m. Both times Worsley waited in the car while the appellant left her for a short period. Security system data from that day showed the front door opened and closed at 8:38 p.m. and the back door opened and closed at 8:49 and 8:50 p.m., respectively.

About 6:00 p.m. and again at 9:00 p.m. that same day, the appellant contacted the victim's niece, Theresa Clyburn, and asked her to check on the victim. When Clyburn arrived at the

- 3 -

townhouse, the lights were on inside, no one answered her knock, and the victim did not answer her phone.

At 11:19 p.m. that night, the appellant called 911 and asked for a welfare check on the victim. He told the 911 operator that he was eleven hours away in Memphis.[4] An officer went to the townhouse about twenty minutes later. Lights were on, but no one answered the door, and the officer heard no sounds inside. There was no car in the allotted parking space. The screen on the front window was bent, but the glass was not broken, and the window was locked. The officer did not enter the premises because he had no authority to do so.

Clyburn returned to the townhouse around midnight with her uncle, who had a key. The front door was partially blocked by a chair pushed against it. Clyburn described the residence as "messed up"—the television was off the wall and a chair was flipped over. "BHB" was written in red on the living room wall. They found the victim's dead body lying face down on the bathroom floor. Her body was cold to the touch. "NO HOE GO GO" was written in a red substance that was not blood on the bathroom mirror. Clyburn called 911 at 1:09 a.m. on January 3, 2021.

Newport News Police Officer Corey Fredenburg arrived at the townhouse within minutes of the 911 call. He found no signs of forced entry to the townhouse and no obstructions at the back door. A pit bull was closed in the spare bedroom. The dog had no food or water, and Fredenburg saw no dog feces or urine in the room.

The cause of the victim's death was blunt force trauma to the head as a result of "at least two blows." The doctor who performed the autopsy testified that the injuries were not consistent

---

[4] Worsley testified that she and the appellant did not go to Memphis. Instead, they stayed in the Hampton Roads area that day.

with an accidental fall.  The weapon used appeared to be a ceramic soap dispenser.  A similar intact dispenser was found in another bathroom.

The appellant's DNA was found in the root of a hair recovered from the victim's right hand.  But the forensic scientist who performed the analysis testified that the hair had little probative value because the appellant and the victim had lived in the same household.

An analysis of the appellant's cell phone showed that on December 31, 2020, he searched the internet for "Newport News active warrants."  Over the next two days, he searched again for active warrants in Newport News, along with breaking news in the area, "fugitive [n]ews" in the area, his name, his wife's name, and "Newport News wanted list."  The appellant gave no statement to the police and did not testify at trial.

The Commonwealth filed a motion *in limine* asking to introduce evidence that the victim had obtained EPOs against the appellant on December 5 and December 31, 2020.  The trial court heard the motion before the trial began.  The appellant argued that the evidence was not admissible under Code § 16.1-253.4(G) because it suggested he had committed a prior bad act and it was more prejudicial than probative.  The Commonwealth argued that it showed the relationship of the parties and also was relevant to other evidence it planned to present.  The court ruled that the December 5 EPO, which had expired, was not admissible because it was too distant in time.  The court further ruled that the Commonwealth could present evidence that an EPO had been issued and served on the appellant December 31, 2020, but that the document itself was not admissible.[5]  Immediately after evidence of the service of the EPO on the appellant was presented, the court instructed the jury that the EPO was not evidence of any wrongdoing by the appellant.

---

[5] The Commonwealth acknowledged that the appellant had obtained an EPO against the victim on December 27, 2020.  The trial court stated that the appellant could present evidence of that fact, but he declined to do so.

A jury found the appellant guilty of second-degree murder. He was sentenced to forty years with three months suspended.

ANALYSIS

The appellant argues that the trial court abused its discretion by allowing testimony about the December 31 EPO. He further argues that the Commonwealth failed to prove beyond a reasonable doubt that he was the killer.

### I. Admissibility of EPO Evidence

An appellate court reviews a trial court's decision to admit evidence under an abuse of discretion standard. *See, e.g.*, *Commonwealth v. Proffitt*, 292 Va. 626, 634 (2016)*.* A reviewing court can conclude that "an abuse of discretion has occurred" only when "reasonable jurists could not differ" about the correct result. *Commonwealth v. Swann*, 290 Va. 194, 197 (2015) (quoting *Grattan v. Commonwealth*, 278 Va. 602, 620 (2009)). "This bell-shaped curve of reasonability" guiding appellate review "rests on the venerable belief that the judge closest to the contest is the judge best able to discern where the equities lie." *Minh Duy Du v. Commonwealth*, 292 Va. 555, 564 (2016) (quoting *Sauder v. Ferguson*, 289 Va. 449, 459 (2015)). "In evaluating whether a trial court abused its discretion, . . . '[this Court does] not substitute [its] judgment for that of the trial court. Rather, [the Court] consider[s] only whether the record fairly supports the trial court's action.'" *Lambert v. Commonwealth*, 70 Va. App. 740, 749 (2019) (first, second, and fourth alterations in original) (quoting *Grattan*, 278 Va. at 620).

Evidence that a defendant committed prior bad acts "is generally not admissible to prove the character trait of a person in order to show that the person acted in conformity therewith." Va. R. Evid. 2:404(b). Even so, such evidence may be admissible for other purposes, including to establish "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, [or] accident," or to show that the prior acts "are part of a common scheme or plan."

*Id.*; *see, e.g.*, *Vera v. Commonwealth*, 77 Va. App. 271, 281 (2023) (noting that such evidence is admissible if it is "relevant to a material issue or element of consequence in the case" (quoting *Shifflett v. Commonwealth*, 29 Va. App. 521, 529 (1999))). If the prosecution seeks to introduce evidence of a prior bad act for a permissible purpose, in order for that evidence to be admissible, its "legitimate probative value" must "outweigh[] its incidental prejudice." Va. R. Evid. 2:404(b); *see also Spencer v. Commonwealth*, 240 Va. 78, 90 (1990) ("Whenever the legitimate probative value outweighs the incidental prejudice to the accused, evidence of prior offenses, if otherwise competent, is admissible." (quoting *Lewis v. Commonwealth*, 225 Va. 497, 502 (1983))).[6]

In conducting our analysis, we consider first whether the evidence was relevant for any permissible purpose and then apply the balancing test. Virginia "follows an 'inclusionary approach' to the uncharged misconduct doctrine by admitting [other-crimes] evidence 'if relevant[] for any purpose *other than* to show a mere propensity.'" *Castillo v. Commonwealth*, 70 Va. App. 394, 415 (2019) (quoting *Thomas v. Commonwealth*, 44 Va. App. 741, 757 n.8, *adopted upon reh'g en banc*, 45 Va. App. 811 (2005)). Permissible purposes include "show[ing] the conduct or attitude of the accused toward his victim" or "establish[ing] the relationship between the parties." *Kenner v. Commonwealth*, 299 Va. 414, 424 (2021) (quoting *Ortiz v. Commonwealth*, 276 Va. 705, 714 (2008)). Evidence of prior bad acts may also be admissible if

---

[6] In addition, for any relevant evidence to be admissible, its "probative value" cannot be "substantially outweighed by . . . the danger of unfair prejudice." Va. R. Evid. 2:403(a). The appellant argues that the prejudice standard set forth in Virginia Rule of Evidence 2:403(a) is significantly less strict than the prejudice balancing test in Rule 2:404(b). Based on this reasoning, he urges us to apply the latter test. We address the appellant's evidentiary challenge as he has framed the issue under Rule 2:404(b) and do not reach the ancillary point regarding the purported significance of the different language used in the two rules. *See generally Commonwealth v. White*, 293 Va. 411, 419 (2017) ("[T]he doctrine of judicial restraint dictates that we decide cases 'on the best and narrowest grounds available.'" (quoting *Swann*, 290 Va. at 196)).

it "is connected with or leads up to the offense for which the accused is on trial." *Woodfin v. Commonwealth*, 236 Va. 89, 95 (1988) (quoting *Kirkpatrick v. Commonwealth*, 211 Va. 269, 272 (1970)).

In this case, the EPO was evidence of the strained state of the appellant's marital relationship with the victim. *See generally* Va. R. Evid. 2:401 (explaining that evidence is relevant if it has "any tendency to make the existence of any fact in issue more probable or less probable than it would be without the evidence"). In addition, the course of events connects the timing of service of the December 31 EPO to the victim's death. The EPO was served on the appellant the day it was issued. Worsley was at the townhouse when the EPO was served.[7] Less than an hour later, the appellant left with Worsley so the victim could "get her belongings." He and Worsley went to stay at a hotel. Around noon the following day, the appellant had Worsley drive him back to the area of the townhouse. She remained in the car while the appellant left her sight for some time. During the approximately twenty minutes they were there, a different witness, Williams, heard the victim screaming over the telephone with a male voice in the background, and then she was never heard from again. This evidence, viewed in its entirety, supports the trial court's ruling regarding the probative value of the EPO to prove both the relationship between the appellant and the victim and the course of events leading up to the

---

[7] This is a reasonable inference based on the evidence presented below. Worsley arrived at the townhouse the same day the warrant was served. While Worsley and the appellant were in the townhouse, Worsley heard "keys at the door." The appellant opened the front door, and Worsley heard a woman's voice. Worsley left and waited in the parking lot, noticing police lights.

victim's death.[8]  This does not, however, end the inquiry.  Whether it was admissible for these purposes depends on a weighing of its probative value against any prejudicial effect.

Evidence of other bad acts is admissible only if the "legitimate probative value of such proof outweighs its incidental prejudice" to the defendant.  *Kenner*, 299 Va. at 427 (quoting Va. R. Evid. 2:404(b)).  "The responsibility for balancing the competing considerations of probative value and prejudice rests in the sound discretion of the trial court."  *Spencer*, 240 Va. at 90; *accord Kenner*, 299 Va. at 427.

Admission of evidence that the victim had obtained a recent EPO against the appellant was certainly prejudicial.  *See, e.g.*, *Fields v. Commonwealth*, 73 Va. App. 652, 672-73 (2021) (noting that "[a]ll evidence tending to prove guilt is prejudicial to an accused" (quoting *Powell v. Commonwealth*, 267 Va. 107, 141 (2004))).  In that regard, the trial court took measures to limit the prejudicial impact.  The jury heard only that the EPO was issued and served on the appellant on December 31, 2020, and the actual document was not admitted into evidence.  In addition, the court cautioned the jury that the EPO was not evidence of any wrongdoing by him.  Any incidental prejudice was cured by these actions of the court.[9]  *See Brooks v. Commonwealth*, 73 Va. App. 133, 148 (2021) ("The danger of unfair prejudice can . . . be mitigated by an instruction to the jury that limits their consideration of other crimes evidence to its proper purposes and application to each offense charged.").  The jury is "presumed to follow prompt, explicit, and

---

[8] The appellant argues that because the EPO was issued solely on an "untested ex parte allegation," it was less probative than a "permanent" protective order issued under Code §16.1-279.1 after a full judicial hearing and a finding by a preponderance of the evidence that domestic violence had occurred.  As explained, evidence of the EPO was not admitted to establish the truth of the allegation the victim made to obtain it.  Instead, it had probative value because she obtained it shortly before her death and because it was served on the appellant while Worsley was at the townhouse and explains his and Worsley's actions that followed.

[9] Indeed, defense counsel did not ask for an additional curative instruction after the close of all the evidence, noting that the original curative instruction was "sufficient."

curative instructions." *Beavers v. Commonwealth*, 245 Va. 268, 280 (1993); *see Jones v. Commonwealth*, 71 Va. App. 70, 92 (2019). Nothing in the record indicates the jury failed to follow the specific instruction it was given.

The record supports the trial court's ruling that the probative value of the evidence on the combination of purposes for which it was offered outweighed the obvious yet incidental prejudice. In light of the record as a whole, we hold the trial court did not abuse its discretion by admitting testimony about the issuance and service of the EPO on December 31, 2020. *See Osman v. Commonwealth*, 76 Va. App. 613, 639-41 (2023) (holding that the trial court did not abuse its discretion in allowing evidence that the defendant had previously physically and verbally abused his wife because the evidence was relevant to motive, intent, and the parties' prior relationship, and the jury was instructed the evidence could be considered only for that limited purpose); *Castillo*, 70 Va. App. at 416-18 (holding that where the defendant was on trial for the first-degree murder of his wife and burglary of her home, the trial court did not abuse its discretion in admitting evidence of a protective order the victim had obtained against the defendant because the order was relevant to issues in the case and was not unduly prejudicial). Therefore, we affirm the trial court's evidentiary ruling. *See Nottingham v. Commonwealth*, 73 Va. App. 221, 231 (2021) (stating that absent an abuse of discretion, a trial court's evidentiary ruling will be upheld on appeal).

## II. Sufficiency of the Evidence

It is well established that when considering the sufficiency of the evidence, an appellate court views the evidence "in the light most favorable to the Commonwealth, the prevailing party at trial." *Barnett v. Commonwealth*, 73 Va. App. 111, 115 (2021) (quoting *Smith v. Commonwealth*, 66 Va. App. 382, 384 (2016)). "Viewing the record through this evidentiary prism requires us to 'discard the evidence of the accused in conflict with that of the

Commonwealth, and regard as true all the credible evidence favorable to the Commonwealth and all fair inferences to be drawn'" from that evidence. *Commonwealth v. Barney*, ___ Va. ___, ___ (Mar. 16, 2023) (quoting *Commonwealth v. Perkins*, 295 Va. 323, 323-24 (2018) (per curiam)).

When engaging in such review, "the judgment of the trial court is presumed correct and will not be disturbed unless it is plainly wrong or without evidence to support it." *Ingram v. Commonwealth*, 74 Va. App. 59, 76 (2021) (quoting *Smith v. Commonwealth*, 296 Va. 450, 460 (2018)). "It has long been deemed 'an abuse of the appellate powers to set aside a verdict and judgment[] because an appellate court, from the evidence as written down, would not have concurred in the verdict.'" *Barney*, ___ Va. at ___ (quoting *Perkins*, 295 Va. at 327). Accordingly, "the relevant question is whether '*any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt.'" *Washington v. Commonwealth*, 75 Va. App. 606, 615 (2022) (quoting *Vasquez v. Commonwealth*, 291 Va. 232, 248 (2016)). "In applying this standard of review, we eschew the divide-and-conquer approach, which examines each incriminating fact in isolation, finds it singularly insufficient, and then concludes that the sum of these facts can never be sufficient. Instead, in an appellate sufficiency review, the evidence is 'considered as a whole.'" *Barney*, ___ Va. at ___ (quoting *Stamper v. Commonwealth*, 220 Va. 260, 273 (1979)).

The Commonwealth's case was based wholly on circumstantial evidence. "[C]ircumstantial evidence is . . . entitled to as much weight as direct evidence provided that [it] is sufficiently convincing to exclude every reasonable hypothesis except that of guilt." *Pijor v. Commonwealth*, 294 Va. 502, 512 (2017) (first alteration in original) (quoting *Dowden v. Commonwealth*, 260 Va. 459, 468 (2000)). But the "hypotheses [that] must be reasonably excluded are those [that] flow from the evidence itself, and not from the imagination of

defendant's counsel." *Id.* (quoting *Turner v. Commonwealth*, 218 Va. 141, 148 (1977)). "The reasonable-hypothesis principle . . . is 'simply another way of stating that the Commonwealth has the burden of proof beyond a reasonable doubt.'" *Commonwealth v. Moseley*, 293 Va. 455, 464 (2017) (quoting *Commonwealth v. Hudson*, 265 Va. 505, 513 (2003)).

The appellant contends that he was in the area of the townhouse to check on his cars, which he suggests was reasonable behavior under the circumstances. He adds that it was not conceivable that he could have killed his wife in the short time frame established by the evidence. The law in this area is clear. "[W]hether an alternate hypothesis of innocence is reasonable is a question of fact . . . ." *Maust v. Commonwealth*, 77 Va. App. 687, 700 (2023) (en banc) (quoting *Wood v. Commonwealth*, 57 Va. App. 286, 306 (2010)). "As long as 'a rational factfinder could reasonably reject [the appellant's] theories in his defense and find that the totality of the suspicious circumstances proved [his guilt] beyond a reasonable doubt,' the appellate court must affirm the conviction." *Id.* at 700-01 (quoting *Park v. Commonwealth*, 74 Va. App. 635, 654 (2022) (alterations in original)). "[M]erely because [a] defendant's theory of the case differs from that taken by the Commonwealth does not mean that every reasonable hypothesis consistent with his innocence has not been excluded. What weight should be given evidence is a matter for the [factfinder] to decide," not the appellate court. *Edwards v. Commonwealth*, 68 Va. App. 284, 301 (2017) (second and third alterations in original) (quoting *Haskins v. Commonwealth*, 44 Va. App. 1, 9 (2004)). The record here supports the jury's rejection of the appellant's theories and its ultimate conclusion.

Data retrieved from the cell phone accounts of the appellant, Worsley, Williams, and the victim, as well as data from the residential security system at the townhome, links the appellant to the time and place of the killing. Worsley's testimony and data from her cell phone account established that she and the appellant were outside the townhouse on January 1, 2021, from

11:56 a.m. to 12:15 p.m. The security system data showed that the back door opened at 12:02 p.m. and closed at 12:09 p.m. Williams was talking on the phone with the victim when he heard a "banging" sound, a male voice, and the voice of the victim as she screamed before the phone call abruptly ended at 12:07 p.m. The victim was not heard from or seen alive again. Her cell phone stopped receiving data at 1:14 a.m. and was never found. The reasonable inference from this evidence is that the appellant killed his wife shortly after noon on January 1, 2021.

The next day, January 2, 2021, Worsley and the appellant returned to the area of the townhouse at 8:36 p.m. Worsley waited in the car while the appellant left her for a short period. Security system data from that day showed the front door opened and closed at 8:38 p.m. and the back door opened and closed at 8:49 and 8:50 p.m. A reasonable factfinder could infer from this evidence that the appellant returned to the townhouse, the scene of the crime, at this time. Although his reason for returning is unclear, the jury could find that his entry into the townhouse while the victim lay dead was further evidence of his guilt.[10]

The appellant's conduct around the time of the murder supports his guilty knowledge. "Circumstances tending to prove guilty knowledge include the defendant's acts, statements, and conduct." *Hawkins v. Commonwealth*, 288 Va. 482, 486 (2014). He lied when he told the 911 operator on January 2, 2021, that he was in Memphis, even though he was in Newport News. "A false account, similar to flight from a crime scene, is a circumstance a fact[]finder may properly consider as evidence of guilty knowledge." *Id.* His internet searches for the victim's name, his own name, any active warrants for him, breaking news, and fugitive news also indicate guilty knowledge. Detective Parker testified that the search history recovered from the appellant's

---

[10] The Commonwealth hypothesizes that the appellant staged the scene during this time. Further, it is a reasonable inference the appellant took care of the dog at some point during this visit, because a pit bull was shut in a bedroom, but there were no signs of dog feces or urine in the room when the police arrived.

phone showed that on December 31, 2020, at 3:42 p.m. he searched "Newport News active warrants." At various times after 3:20 p.m. on January 1, 2021, the appellant's phone showed searches for "Newport News active warrants," "WAVY 10," "WAVY 10 breaking news, Newport News," and "WAVY 10 fugitive News." At 9:07 p.m., searches were made for "Tyrone Pair" and "Sammy Pair." The same searches for "breaking news" were repeated on the mornings of January 2 and 3, 2021.

Additionally, the appellant's DNA was extracted from part of a hair recovered from the victim's hand. Although that evidence is not as probative as it would be if the appellant had not lived in the same household, it is still before the jury as a factor to be considered. *See Church v. Commonwealth*, 71 Va. App. 107, 122-23 (2019) (stating that it is the jury's responsibility to determine what weight to give admitted evidence). This is particularly true based on its location on the hand of the dead victim.

A case based entirely on circumstantial evidence "requires an unbroken evidentiary chain of necessary circumstances, which satisfies 'the guarded judgment that both the corpus delicti and the criminal agency of the accused have been proved to the exclusion of any other rational hypothesis and to a moral certainty.'" *Moseley*, 293 Va. at 463 (quoting *Wright v. Commonwealth*, 292 Va. 386, 397 (2016)). "[A] factfinder cannot 'arbitrarily' choose, as between two equally plausible interpretations of a fact, one that incriminates the defendant." *Vasquez*, 291 Va. at 250 (quoting *Dixon v. Commonwealth*, 162 Va. 798, 803 (1934)). The choice, however, is arbitrary "only when no rational factfinder could believe the incriminating interpretation of the evidence and disbelieve the exculpatory one." *Id.* That is not the case here.

The reasonable inferences to be drawn from the facts in this case are not "so attenuated that they 'push "into the realm of *non sequitur*."'" *Perkins*, 295 Va. at 332 (quoting *Bowman v. Commonwealth*, 290 Va. 492, 500 (2015)). Rather, the evidence here reflects the "combined

- 14 -

force of many concurrent and related circumstances" reasonably leading to a conclusion of guilt. *Dowden*, 260 Va. at 470 (quoting *Stamper*, 220 Va. at 273). The jury, as the factfinder, "determine[d] which reasonable inferences should be drawn from the evidence[] and whether to reject as unreasonable the hypotheses of innocence advanced by [the] defendant." *Moseley*, 293 Va. at 464. The appellant has not shown that the jury was "plainly wrong" in rejecting his hypothesis of innocence. *See Maust*, 77 Va. App. at 706 (quoting *Wood*, 57 Va. App. at 306). Accordingly, we hold the evidence was sufficient to support the jury's verdict finding the appellant guilty of second-degree murder.

## CONCLUSION

The trial court did not abuse its discretion in allowing evidence that the murder victim, the appellant's wife, had obtained an EPO against the appellant and that it was served on him less than twenty-four hours before she was killed. The evidence was sufficient to establish the appellant's guilt of second-degree murder beyond a reasonable doubt and excludes hypotheses of innocence that flow from the evidence. Therefore, we affirm the conviction.

*Affirmed*.